Quiggle Unemployment Compensation Case.
Erie Resistor Corporation, Appellant, *v.* Unemployment Compensation Board of Review.

Argued November 13, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and GUNTHER, JJ. (ARNOLD, J., absent).

*Henry A. MacDonald,* with him *Frederick F. Jones* and *Gifford, Graham, MacDonald & Illig,* for appellant.

*William L. Hammond,* Special Deputy Attorney General, with him *Robert E. Woodside,* Attorney General, for appellee.

OPINION BY DITHRICH, J., January 20, 1953:

This is an appeal by the employer, Erie Resistor Corporation, from the decision of the Unemployment Compensation Board of Review reversing the decision of the referee and allowing benefits under the Unemployment Compensation Law of December 5, 1936, P. L. (1937) 2897, as amended, 43 PS §751, to claimant, Lois A. Quiggle, for the week ending October 9, 1951.

Among others, the Board made the following findings of fact:

"1. The claimant was last employed by the Erie Resistor Corporation for approximately 11 months, her last day of work being July 20, 1951, on which date she was laid off.

"2. Claimant, who customarily worked on the third shift, was recalled to work by the Erie Resistor Corporation on October 2, 1951 and offered employment on the first shift [7 a.m. to 3:30 p.m.]. Claimant did not accept the offer because of the necessity of caring for her small child during the hours of the first shift, but she stated that she was willing to accept work on either the second or third shifts. She was told that no such work was available and she continued unemployed.

"3. Claimant's husband worked the first shift and was in a position to care for their child upon returning from work. Had work on the second shift been available to the claimant, she could have arranged for a neighbor to care for her child during the short period at the change of shifts when both she and her husband would be away from home. Claimant's husband would have been present throughout the entire third shift to care for the child."

Appellant contends that under sections 402(a)[1] and 401(d)[2] of the Law, 43 PS §§802(a), 801(d), claimant is ineligible for compensation because her unemployment was due to her failure, without "good cause," to accept suitable work and because she was not "available" for suitable work.

Pointing chiefly to claimant's statement that she didn't want to place her child in a day nursery because

---

[1] Section 402 provides, inter alia: "An employe shall be ineligible for compensation for any week—(a) In which his unemployment is due to failure, without good cause, . . . to accept suitable work when offered to him by the employment office or by any employer . . ."

[2] Section 401 provides, inter alia: "Compensation shall be payable to any employe who is or becomes unemployed, and who . . . (d) Is able to work and available for suitable work. "

"he's so small," appellant argues that claimant's refusal to accept first shift work was based on personal convenience rather than compelling circumstances and therefore was without "good cause." The argument is negatived by *Mooney Unemployment Compensation Case*, 162 Pa. Superior Ct. 183, 56 A. 2d 386. There we held that the claimant, a married woman with small children, had "good cause" for quitting her employment, after her employer had eliminated the night shift which she had customarily worked, because she could not take care of her children if she worked the only shift offered her, a shift beginning at 11:30 a.m. We repeated in that case (pp. 186, 187) what this Court said, speaking through RENO, J., in *Sturdevant Unemployment Compensation Case*, 158 Pa. Superior Ct. 548, 556, 557, 45 A. 2d 898, with respect to personal reasons as constituting "good cause," viz.: " 'However, in whatever context they appear, they connote, as minimum requirements, real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith. . . . [I]f a worker leaves his employment when he is compelled to do so by necessitous circumstances or because of legal or family obligations, his leaving is voluntary with good cause, and under the act he is entitled to benefits. The pressure of necessity, of legal duty, or family obligations, or other overpowering circumstances and his capitulation to them transform what is ostensibly voluntary unemployment into involuntary unemployment.' " We then said (p. 187) : "Measured by these tests, claimant had 'good cause' for quitting her employment. She was legally obligated to care for her three small children. Family obligations cannot be considered as mere whim or fancy but, on the contrary, are real and compelling reasons."

That language applies with equal force to the facts in the instant case.

But "good cause" never exists without good faith. "The vitalizing element of good cause is good faith. ... Good faith, in this context, embraces not only the merely negative virtue of freedom from fraud but also positive conduct which is consistent with a genuine desire to work and to be self-supporting. Good faith never resides in a claimant who is seeking to take advantage of his benefit rights in order to have a compensated vacation from work": *Brilhart Unemployment Compensation Case,* 159 Pa. Superior Ct. 567, 569, 49 A. 2d 260.

Appellant argues that claimant made no effort to look for work after her layoff and therefore was not acting in good faith. At the hearing before the referee, claimant testified that she had placed no applications for work because she was unable to "get out much to look for work." But she said that her husband and her sister had made inquiries for her. The Board found: "5. Due to the fact that employers in the area were, to a considerable extent, curtailing production and reducing their forces, claimant's prospects for marketing her services were practically nil. These employers had a considerable number of employees in lay off status at the time and it was customary that these employees be recalled before work could be offered to new employees. For this reason claimant would have had difficulty marketing her services and an extensive search for work would have been practically futile." We agree with the Board that the circumstances of this case do not indicate that claimant was seeking a "compensated rest."

One may impose conditions or limitations as to employment and yet be "available" within the meaning of section 401(d). *Sturdevant Unemployment Com-*

*pensation Case,* supra; *Mooney Unemployment Compensation Case,* supra. In the *Mooney* case the claimant had voluntarily left her employment with good cause. We held that she was "available" although she refused work on a shift which began at 11:30 a.m. and would accept work only on a day shift beginning at 9 a.m. or any night shift between the hours of 6 p.m. and 6 a.m.

The basic purpose of the statutory requirement of availability "is to establish that a claimant is actually and currently attached to the labor force." *Sturdevant Unemployment Compensation Case,* supra, p. 560; *Shellhammer Unemployment Compensation Case,* 162 Pa. Superior Ct. 327, 328, 57 A. 2d 439; *Mattey Unemployment Compensation Case,* 164 Pa. Superior Ct. 36, 41, 63 A. 2d 429. It is clear that a claimant is attached to the labor force so long as he is able to do some type of work and there is a reasonable opportunity for securing such work in the vicinity in which he lives. *Sturdevant Unemployment Compensation Case,* supra.

In the *Mooney* case, supra, a case so closely in point as to practically rule this case, we said (p. 187): "The time claimant was thus available for work was approximately twenty hours each day; claimant lived in Philadelphia where there are many job opportunities and she did not restrict the type of work she was willing to accept during these twenty hours. In view of the fact that she had experience as a waitress there is little doubt *there was a labor market for claimant's services.*" (Emphasis added.)

What conditions prevail in a given labor market is a matter of fact. *Sturdevant Unemployment Compensation Case,* supra. Here the Board has found that "4. The Erie Resistor Corporation continued to operate a second and third shift during the period of the unemployment here involved and work opportunities

*normally* existed in the locality for the marketing of the claimant's services during the hours in which she was ready, willing, and able to work." (Emphasis added.)

Since normally there were opportunities for claimant to secure work on the second and third shifts in the vicinity in which she lived, there was a labor market for her limited services and, consequently, she had not detached herself from the labor force and was "available."

This case is readily distinguishable from *Squires Unemployment Compensation Case,* 172 Pa. Superior Ct. 424, 94 A. 2d 172, the opinion in which, by RENO, J., was this day filed. In the *Squires* case the Board found (p. 426) : "3. There was no normally existing labor market for claimant's services in St. Marys, Pa., on a shift beginning at 11:00 P.M. and ending at 7:00 A.M., the only shift on which claimant was in a position to accept employment." In the instant case the Board found: "4. . . . work opportunities normally existed in the locality for the marketing of the claimant's services during the hours in which she was ready, willing, and able to work." The fact that a labor market normally existed for claimant's services, and not the fact that such market was temporarily absent due to a labor depression, is controlling.

The findings of the Board which we have quoted are fully supported by substantial evidence and therefore are binding upon us. *Wilsey Unemployment Compensation Case,* 169 Pa. Superior Ct. 368, 82 A. 2d 503.

Decision affirmed.

HIRT, J., dissents.