ROSE, Justice.
Robert F. Fagan brought this action against John E. Scott, Jr. to recover unpaid wages earned as a handyman in the repair and renovation of various rental properties owned by the defendant. In addition, Fa-gan claimed damages which had allegedly been incurred as a result of Scott’s failure to contribute to Wyoming’s unemployment fund and also sought to compel Scott to pay social security taxes on all earned wages. Finally, Fagan asked the court to award punitive damages and reasonable attorney’s fees, because of defendant’s willful and fraudulent conduct in failing to comply with state and federal employment security laws.
In defense of these claims Scott urged that Fagan worked not as an employee but as an independent contractor who had received full compensation for his services under various contracts. Scott counter *807 claimed for past-due rent, which liability the plaintiff conceded at trial.
Following a trial to the court, the district judge found Fagan to be an employee and awarded damages for lost unemployment benefits in the sum of $1,859.[1] However, the court was unable to determine whether any claimed wages remained unpaid, because of the confused state of the records and the substantial number of documented payments made by Scott to the plaintiff. The court awarded punitive damages of $500, but declined to compensate Fagan for attorney’s fees or to direct the defendant to pay social security taxes. The court further determined that Fagan’s award was subject to a set-off in the amount of $1,535 for unpaid rent plus $17 for gasoline erroneously charged to Scott’s account. Both parties have appealed. We will reverse the award of punitive damages and affirm the judgment in all other respects.
FACTS
Robert Fagan and his family rented housing from John Scott, who owns various rental properties in Casper, Wyoming. During the summer of 1981, Fagan approached Scott and offered to paint some of his property in exchange for past-due rent. Scott agreed and, upon the successful completion of that project, hired Fagan to repair and renovate the rental units and to maintain the trucks and other equipment. From August 17, 1981, to March 18, 1982, Scott compensated Fagan at the rate of $5 per hour. On March 19, 1982, Fa-gan’s pay increased to $6 per hour and remained at that level until he terminated his employment on November 9, 1982.
Scott assigned work to Fagan on a daily basis, frequently visited Fagan on the job, and transported him from one project to another. Scott provided all materials, tools, and equipment and authorized charges by Fagan to Scott’s accounts with equipment and building supplies dealers. Fagan worked exclusively for Scott, except for assisting friends with minor projects, and often expended more than 40 hours on the job each week.
In April, 1982, Scott purchased and paid for business cards, a business stamp, and invoice books, all purporting to represent Fagan as an independent contractor in the renovation and repair business. Thereafter, when Fagan wished to be paid his wages, Scott would make out an invoice for services performed on a contract at one of his rental addresses. He would then direct Fagan to acknowledge receipt of the specified sums by signing the invoice.
Early in November, 1982, Scott advised Fagan that no future earnings would be paid until Fagan settled his rent arrearag-es. When Fagan failed to receive his wages due on November 9, he left his job and applied for unemployment compensation. Since Scott had made no contributions to the state employment security fund, Fagan was denied unemployment benefits. This suit followed.
At trial Fagan produced his daily record books, indicating the number of hours worked and the compensation received from Scott. According to these records, Fagan worked hours for which he received no payment. Scott’s evidence consisted of numerous canceled checks endorsed by Fa-gan and the receipted invoices. These documents, for .the most part, do not correspond to the daily records kept by Fagan. Many of the checks bear the notation “Advance” or “Advance on [specified] Contract.” Some checks indicate that they were issued to reimburse Fagan for expenses or to compensate him for a separate trash-hauling contract. As a result of this state of confusion, the trial judge could not determine with certainty that Fagan was entitled to back wages.
Scott appeals the court’s award .of damages for lost unemployment benefits and the award of punitive damages. Fagan cross-appeals the denial of unpaid wages *808 and attorney’s fees. We will affirm the judgment with the exception of the award for punitive damages.
ISSUES
Appellant Scott presents the following issues for review:
“1. Whether the District Court had jurisdiction to make the initial determination that an employer/employee relationship existed in the context of unemployment compensation.
“2. Whether the Unemployment Compensation Statutes require further determinations to establish an entitlement to benefits and did the District Court err in not making these determinations.
“3. Whether the District Court erred in finding that the Appellee was an employee under the facts of this case.
“4. Whether the District Court erred in awarding punitive damages against the Appellant.”
Cross-appellant Fagan raises these questions:
“I. Whether the Trial Court erred in refusing to grant judgment to [Cross-]Appellant for $1,752 unpaid wages earned by [Cross-]Appellant.
“II. Whether the Court erred in refusing to allow [Cross-]Appellant attorney’s fees in the amount of $2,025 and accruing attorney’s fees pursuant to Wyoming Statutes republished 1977, Section 27-4-104.”
I
“Whether the District Court had jurisdiction to make the initial determination that an employer/employee relationship existed in the context of unemployment compensation.”
Scott urges this court to invoke the doctrine of primary jurisdiction and overturn the trial court’s determination of the parties’ employment relationship, on the ground that the State Employment Security Commission, not the district court, has exclusive original jurisdiction to decide employment-status questions in the context of unemployment compensation.[2] The United States Supreme Court described the appropriate application of the primary-jurisdiction doctrine in Far East Conference v. United States, 342 U.S. 570, 574-575, 72 S.Ct. 492, 494-495, 96 L.Ed. 576 (1952):
“ * * * [I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.”
Thus, the rationale for the primary-jurisdiction rule rests in the desire for uniformity of regulation and the availability of a legislatively established body of experts. We approved of the doctrine and its rationale in Kearney Lake, Land & Reservoir Company v. Lake DeSmet Reservoir Company, Wyo., 487 P.2d 324 (1971), holding that the State Board of Control, rather than the district court, should initially determine the question of abandonment of water rights.
In the instant case, appellant attempts to invoke the doctrine of primary jurisdiction for the first time on appeal. We have said repeatedly that we will not consider an issue raised for the first time *809 here unless it concerns the court’s jurisdiction or addresses a fundamental right. Pine Creek Canal No. 1 v. Stadler, Wyo., 685 P.2d 13 (1984); ABC Builders, Inc. v. Phillips, Wyo., 632 P.2d 925 (1981); City of Rock Springs v. Police Protection Association, Wyo., 610 P.2d 975 (1980). Since the primary-jurisdiction doctrine rests on the principle of consistent and knowledgeable decision-making and concerns not at all the court’s subject-matter jurisdiction or power to hear the case, we decline to address this issue.
We note in passing, however, that courts have historically determined the existence of the employee-employer relationship and, therefore, possess sufficient experience and capability to rule on such matters.
“ * * * The desirability of court abstention ' diminishes where the court faces factual issues of the sort that it considers routinely.” United States v. Zweifel, 508 F.2d 1150, 1156 (10th Cir. 1975), cert. denied 423 U.S. 829, 96 S.Ct. 47, 46 L.Ed.2d 46.
See also People v. Fremont Energy Corporation, Wyo., 651 P.2d 802 (1982).
II
“Whether the Unemployment Compensation Statutes require further determinations to establish an entitlement to benefits and did the District Court err in not making these determinations.”
Section 27-3-311(a)(i), W.S.1977, of the Employment .Security Law predicates an award of unemployment compensation upon a finding that an applicant who voluntarily left his work did so with good cause. That section provided at the time pertinent here:
“(a) An individual shall be disqualified from benefit entitlement for eight (8) calendar weeks if the commission finds that he:
“(i) Left his most recent work voluntarily without good cause; * * * ”
This court defined “good cause,” as contemplated by § 27-3-311(a)(i), in Sage Club, Inc. v. Employment Security Commission of Wyoming, Wyo., 601 P.2d 1306, 1310 (1979):
“ ‘ * * * [S]uch a cause as justifies an employee’s voluntarily leaving the ranks of the employed and joining the ranks of the unemployed; the quitting must be for such a cause as would reasonably motivate in a similar situation the average able-bodied and qualified worker to give up his or her employment with its certain wage rewards in order to enter the ranks of the compensated unemployed. The terms “good cause” and “personal reasons” connote, as minimum requirements, real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results; adequate excuses that will bear the test of reason; just grounds for action. * * * ’ 81 C.J.S. Social Security and Public Welfare § 226a, pp. 448-452; Erie Resistor Corporation v. Unemployment Compensation Board of Review, 1953, 172 Pa.Super. 430, 94 A.2d 367, 369 * * *.”
In this appeal Scott contends that the district court erred in failing to consider and determine whether Fagan terminated his employment for good cause.
We have said in the past that a general finding and judgment carries with it every finding of fact which can reasonably and fairly be drawn in favor of the successful party. Burk v. Burzynski, Wyo., 672 P.2d 419, 425 (1983). Furthermore, as an appellate court, we must examine the evidence in a light most favorable to the prevailing party and resolve all conflicts in the testimony and exhibits in his favor. Unless clearly erroneous, we will not disturb the findings of the trial court on appeal. Burk v. Burzynski, supra.
In the instant case, Fagan testified that he left his job when Scott refused to pay his wages. Fagan admitted that his rent payments were delinquent, but contended that his past-due wages exceeded his rent obligation. Fagan testified:
*810 “ * * * He [Scott] wanted me to work for free to pay off my rent.”
We believe that appellant’s conviction that Scott was erroneously withholding wages constitutes good cause under § 27-3-311(a)(i) and supports the trial court’s award of damages for lost unemployment benefits.
Ill
“Whether the District Court erred in finding that the Appellee was an employee under the facts of this case.”
The definition of “employment” found in § 27-3-104(b), W.S.1977, of the Employment Security Law governs the employee-or-independent-contractor question in this action for damages resulting from lost unemployment benefits. That section provides:
“(b) Services performed by an individual for wages is [are] employment subject to this act unless the commission finds:
“(i) The individual is free from control or direction over the performance of services by contract and by fact;
“(ii) The service is outside the usual course of business for which the service is performed or it is performed outside all of the employing unit’s places of business; and
“(iii) The individual is customarily engaged in an independent trade, occupation, profession or business.”
Under this statute a wage earner is an employee subject to the Act, unless the presence of three specified circumstances establishes his status as an independent contractor.
We have had occasion to consider this statute in the past. In Unemployment Compensation Commission of Wyoming v. Mathews, 56 Wyo. 479, 111 P.2d 111, 121 (1941), we declined to lay down any general rules, emphasizing that each ease must be decided upon its own set of facts. We noted in Tharp v. Unemployment Compensation Commission, 57 Wyo. 486, 121 P.2d 172, 176 (1942), and See Ben Realty Co. v. Employment Security Commission, Wyo., 416 P.2d 220, 223 (1966), that the right of either party to terminate services at will indicates the relationship of employer and employee. We have identified as a key factor supporting a finding of the employer-employee relationship the right of the hiring party to control the place of work, the scope of work, and the physical premises where the work is performed. Tharp v. Unemployment Compensation Commission, supra.
In the instant case, Scott visited Fagan on the jobsite several times a day, gave direction as to the work in progress, interrupted work to take Fagan to other job-sites, and required Fagan to work on many different projects each week. These circumstances indicate that Scott exercised extensive control over Fagan’s daily, work-related activities. Furthermore, Fagan performed most of his services on the premises owned by Scott. Any of the trappings indicative of Fagan’s status as an independent contractor were purchased by Scott and used by Fagan in order to obtain his weekly wages. We conclude that this evidence amply supports the trial court’s finding that Fagan worked as an employee, rather than as an independent contractor, within the contemplation of the Employment Security Law.
IV
“Whether the District Court erred in awarding punitive damages against the Appellant.”
We recently reviewed the policies in support of punitive damages awards in Adel v. Parkhurst, Wyo., 681 P.2d 886 (1984). We pointed out that punitive damages are intended to punish the defendant and to deter others from similar conduct, not to compensate the plaintiff. 681 P.2d at 890. Consistent with this purpose of punishment, we established a rule requiring evidence of the defendant’s wealth *811 whenever the plaintiff seeks punitive damages:
“ * * * We now hold that in the absence of evidence of a defendant’s wealth or financial condition an award of punitive damages cannot be sustained.” Adel v. Parkhurst, supra, 681 P.2d at 892.
Since no evidence of Scott’s financial condition was presented in this case, we will reverse that portion of the judgment awarding $500 in punitive damages to Fa-gan.
V
“Whether the Trial Court erred in refusing to grant judgment to [Cross-]Appellant for $1,752 unpaid wages earned by [Cross-]Appellant.”
Throughout his employment with Scott, Fagan kept daily records of the number of hours worked and the wages received. These records establish that Fagan worked 1,465.5 hours at $5 per hour and 1,393.5 hours at $6 per hour, for a total of $15,688.50 in wages. Fagan’s record books indicate that he received substantially less than that amount in compensation.
Fagan concedes that his records do not accurately reflect the number and amount of payments received from Scott. He contends, however, that the canceled checks and invoices presented by Scott at trial establish payment only in the amount of $13,936, leaving a balance due of $1,752.50.
Fagan’s position in this court rests entirely on his interpretation of the exhibits presented by both parties at trial. The district judge, in his decision letter, described these exhibits as confusing and concluded:
" * * * The net result of all this confusion * * * is that the Court really cannot be sure that plaintiff is owed more wages in any specific sum, and perhaps is owed no dollars net at all in this area.”
Under these circumstances, we have the right and duty to examine the record and reach our own independent conclusion from the substantial evidence available as to whether Fagan was entitled to additional compensation. Douglas Reservoirs Water Users Association v. Cross, Wyo., 569 P.2d 1280, 1285 (1977).
After carefully examining the exhibits and accompanying testimony, we agree with Fagan that his uncontradicted and unimpeached daily records establish that he worked a sufficient number of hours to justify compensation of $15,-688.50. We cannot agree, however, with Fagan’s computation of the amount paid by Scott as shown by the canceled checks and invoices. Considering only those checks which pertain to Fagan’s wages, including many cheeks marked “Advance,” two checks purporting to be loans,[3] and one check for $311.22 bearing the notation “Adv. for truck accident,” (No. 809, 6/14/82) we conclude that Scott established payment to Fagan of $15,642.72. In addition, Scott produced one receipted invoice for $312 (No. 6159, 8/19/82), for which no corresponding canceled check was introduced, bringing to $15,954.72 the total, established payment to Fagan in wages. Even excluding the questionable advance for the truck accident, we conclude that Scott carried his burden of proof with respect to the affirmative defense of payment.[4] See Morrison v. Reilly, Wyo., 511 P.2d 970, 972 (1973); Rule 8(c), W.R.C.P. Since proof of payment constitutes a complete defense to a suit for remuneration, Natrona Service, Inc. v. Continental Oil Company, 435 F.Supp. 99, 113 (D.C.Wyo.1977), aff’d 598 F.2d 1294 (10th Cir.1979), we hold that the trial court properly denied Fagan’s claim for unpaid wages.
*812 VI
“Whether the Court erred in refusing to allow [Cross-]Appellant attorney’s fees in the amount of $2,025 and accruing attorney’s fees pursuant to Wyoming Statutes republished 1977, Section 27-4-104.”
Section 27-4-104(b), W.S.1977, upon which Fagan bases his claim for attorney’s fees, provides:
“Whenever an employee who has quit or has been discharged from service has cause to bring suit for wages earned and due, and shall establish in court the amount which is justly due, the court shall allow to the plaintiff interest on the past due wages at the rate of eighteen percent (18%) per annum from the date of discharge or termination, together with a reasonable attorney fee and all costs of suit.” (Emphasis added.)
Since Fagan failed to establish in court that wages were justly due, he cannot recover attorney’s fees pursuant to this provision.
The judgment of the district court is reversed with respect to punitive damages and affirmed in all other respects.

. These damages were computed according to the formula set out in § 27-3-303, W.S.1977, of the Wyoming Employment Security Law.

. Section 27-3-601, W.S.1977, creates the Employment Security Commission of Wyoming. Section 27-3-602, W.S.1977, charges the Commission with administering the Wyoming Employment Security Law, §§ 27-3-101 through 27-3-704, W.S.1977, which duty includes determining an applicant’s eligibility for unemployment benefits.

. Fagan testified that loans were to be deducted from future wages.

. The discrepancy between our computations and those of Fagan results from (1) his unexplained failure to include checks in Exhibit L totaling more than $1,000; (2) his failure to account for the receipted invoice for $312; (3) his erroneous exclusion of a $350 payment as outside the pertinent time frame; and (4) his treatment of the advance for the truck accident as an irrelevant payment to a "Truck Account.”